AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.    24MR-856 |
| ROOM 205, WOODSPRING SUITIES, 13001 | ) |
| CENTRAL AVENUE NE, ALBUQUERQUE, NM 87123 | ) |
|  | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ New Mexico
*(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated by reference herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated by reference herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 16, 2024 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Laura Fashing _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   05/02/2024 2:37 pm _____

_____
*Judge's Signature*

City and state:  Albuquerque, New Mexico _____

The Hon. Laura Fashing, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>24MR-856 | Date and time warrant executed:<br>05/21/2024 4:44 pm | Copy of warrant and inventory left with:<br>In Timothy MALEK Nissan Altima |
| Inventory made in the presence of :<br>SA J. Belida | | |

Inventory of the property taken and name of any person(s) seized:

1. Black backpack.

2. plastic bag containing blue pills iwth "M" and "30" scored on both sides.

3. Green plastic grinder containing blue residue.

4. 2 black Glock extended mazazines, one 22 round capacity which contained 20 .40 caliber rounds of ammunition, the second magazine is a 31 round capacity Glock magazine with contained 23 9MM rounds.

5. One black "weighmax" brand scale.

6. One WoodSpring Suites Albuquerque receipt from room #205 bearing the name Timothy MALEK.

7. One blue Apple iPhone unknown serial number in a clear plastic case with a 'chucky" sticker on the case.

8. One loaded black 9mm Glock, model 19c seimiautomatic pistol, serial number NLW279 with a O-Light brand light mounted light, with a black "PMag D-50 drum style magazine with contained 45 rounds of ammunition.

9. One loaded black .40 caliber Glock Gen 4 semiautomatic pistol, serial number BCDN952, with magazine containing 17 rounds of .40caliber ammunition.

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:      05/22/2024

_Executing officer's signature_

Kenneth Garcia-Schnakenberg Task Force Officer
_Printed name and title_

## ATTACHMENT A

*Property to be searched*

The property to be searched is Room 205 at WoodSpring Suites, 13001 Central Avenue NE, Albuquerque, NM 87123, hereinafter "PREMISES," further described as a room within a hotel complex.

The search of the above PREMISES shall include the search of the entire room, and all persons located on the PREMISES on which the items to be seized could be concealed.

The search of the above PREMISES shall include all vehicles parked at, or in front of, the WoodSpring Suites that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicle may be established by evidence that anyone present within the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841(a)(1) and 846, as well as 18 U.S.C. §§ 2 and 922(o), those violations involving Timothy Malek and Ashlee Harper and occurring after February 12, 2024, including:

1. Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, keys, invoices, and reservation confirmation emails.

9. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including but not limited to auto sears, handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the

3

electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| | ) |
| ROOM 205, WOODSPRING SUITES, 13001 CENTRAL | ) |
| AVENUE NE, ALBUQUERQUE, NM 87123 | ) |

Case No.    24MR-856

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated by reference herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | Distribution of controlled substances; conspiracy |
| 18 U.S.C. §§ 2, 922(o) | Aiding and abetting; unlawful possession of a machinegun |

The application is based on these facts:

See attached affidavit, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kenneth A. Garcia-Schnakenberg, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephonically sworn and electronically signed__ *(specify reliable electronic means).*

Date:    May 2, 2024

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

The Hon. Laura Fashing, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:
ROOM 205, WOODSPRING SUITIES, 13001
CENTRAL AVENUE NE, ALBUQUERQUE,
NM 87123

Case No. _____

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, Kenneth Garcia-Schnakenberg, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as Room 205 at WoodSpring Suites, 13001 Central Avenue NE, Albuquerque, NM 87123, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am Task Force Officer of the Drug Enforcement Administration ("DEA") assigned to the Albuquerque District Office. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Task Force Officer since January 2024.

3.      I have been a police officer with the Rio Rancho Police Department since September 2016. I received 26 weeks of specialized training at the Albuquerque Police Department Law Enforcement Academy, as well as several advanced training classes, pertaining to drug trafficking, money laundering, undercover operations, and electronic and physical

surveillance procedures.

    4.    My experience as a Task Force Officer includes, but not limited to, conducting electronic and mobile surveillance, executing search warrants, handling and processing evidence, undercover operations, writing reports, managing cases, and corresponding with Assistant United States Attorneys ("AUSAs") and judges. I have participated in investigations involving purchases from a suspected narcotic trafficker using both undercover operatives and confidential sources. As a result, I am familiar with matters including but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide and launder profits generated from those transactions.

    5.    I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl and methamphetamine, by Timothy Malek and Ashlee Harper. Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with the DEA, and law enforcement officials from other agencies have obtained information regarding the illegal drug and firearms trafficking activities of Malek, Harper, and others (the "SUBJECTS").

    6.    I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

        a.    Information provided by Task Force Officers ("TFO"), Special Agents

2

("SA"), and Intelligence Research Specialists (IRS) of the DEA, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

b.    Results of physical surveillance conducted by agents during the investigation;

c.    A review of telephone toll records and subscriber information;

d.    A review of driver's license and automobile registration records;

e.    Records from commercial databases; and

f.    Records from the National Crime Information Center ("NCIC").

7.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

8.    I believe there is probable cause that the SUBJECTS have committed, are committing, and will continue to commit offenses involving violations of:

a.    21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances;

b.    21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances;

c.    18 U.S.C. § 922(o) – Unlawful possession of a machinegun; and

d.    18 U.S.C. § 2 – Aiding and abetting.

## EVIDENCE SOUGHT DURING SEARCH

9.      Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their hotel and motel rooms, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their hotel/motel rooms, so so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

10.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their hotel/motel rooms, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

11.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these

items on their person, in their hotel/motel rooms, in their vehicles, and in other areas to which they have ready access.

12.      Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

13.      Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their hotel/motel rooms and surrounding garages, and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

14.      Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential

5

associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their hotel/motel rooms. This type of documentation can be stored on digital media and concealed virtually anywhere.

15.     Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

16.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

17.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.  If drug dealers are traveling, they may keep such items in their hotel/motel rooms as well as their vehicles.

18.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging,

7

and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

19.    Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They often maintain these photographs and/or videos on their person or in their hotel/motel rooms, cars, or on computers.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

20.    Drug traffickers often maintain firearms and ammunition on their person, in their hotel/motel rooms, or in their cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

8

21.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

22.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their hotel/motel rooms for ready access and to prevent detection and seizure by officers executing search warrants.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

23.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, keys, invoices, and reservation confirmation emails.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

24.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes

9

personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

25.    A list of items agents seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

26.    As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

27.    *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic

picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Electronic media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

11

      c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

28.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

      a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these

12

biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

13

Case 1:24-mr-00856-LF   Document 4   Filed 05/22/24   Page 22 of 33


d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a

14

fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using

15

one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## PROBABLE CAUSE

30.     The United States, including the DEA, is conducting a criminal investigation of Timothy Malek and Ashlee Harper regarding possible violations of 21 U.S.C. §§ 841 and 846, as well as 18 U.S.C. §§ 2 and 922(o).

31.     The DEA initiated this investigation in February of 2024, based on information provided by a DEA Confidential Source (the "CS"). The CS advised he/she was aware of an individual who was distributing thousands of fentanyl pills within the Albuquerque Metro area and identified photographs of Malek (as the dealer) and Harper (as his girlfriend).

32.     On March 14, 2024, Malek agreed to meet an undercover law enforcement officer (the "UC") to sell the UC 1,500 fentanyl pills and a Glock "auto-sear."[1]  Malek met the UC to

---

[1] An auto-sear, more commonly known as a "switch," is a small device that can be attached to the slide of a Glock pistol to convert it from semi-automatic to automatic. An auto-sear is a "machinegun" even when not attached to a firearm. *See* 18 U.S.C. § 921(a)(24) (incorporating definition of "machinegun" from 26 U.S.C. § 5845(b)); 26 U.S.C.

16

complete the transaction in Albuquerque later that day. Malek arrived at the meet location in a gray Kia Optima registered to Ashlee Harper, his girlfriend, who was present for the transaction and left with Malek afterwards.

33. Agents field-tested the pills, which returned a positive result for the presence of fentanyl.

34. On March 17, 2024, Malek agreed to meet the UC to sell him/her 5,000 fentanyl pills and another Glock auto-sear. Agents conducted surveillance on Malek before the meeting. They watched as Malek, driving a black Nissan Altima, met with Harper, who was driving the same Kia Optima observed on March 17. As Malek completed the transaction with the UC, Harper stayed in the area and observed the deal. After the meeting, Malek left the area, while Harper remained. Malek then returned to the area and met with Harper. Based on my training and experience, I believe that Harper is acting as a lookout for Malek. She observes drug transactions in an attempt to provide countersurveillance against law enforcement and potential protection against others who might attempt to rob Malek.

35. Agents field-tested the pills, which returned a positive result for the presence of fentanyl.

---

§ 5845(b) (defining "machinegun," in relevant part, as "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun" that "shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger").

36.    On April 9, 2024, Malek agreed to meet with the UC to sell him/her 5,500 fentanyl pills and yet another Glock auto-sear.  Malek arrived in a silver Nissan Altima (Agents learned Malek acquired this vehicle after crashing the black Nissan he was seen in previously) and met with the UC.  Harper's Kia remained nearby for the transaction, and Harper left the area first.  The two vehicles then traveled in tandem to a nearby location, which agents suspect to be an AirBnB Malek and Harper used for a short time.

37.    On April 11, 2024, agents observed Malek and Harper as they left that nearby location in two separate vehicles: Malek in the Nissan Altima, and Harper in the Kia Optima.  The two traveled in tandem from the suspected AirBnB to the Extra Space Storage at 1200 Legion Road NE in Albuquerque.  Agents observed the two vehicles then leave the storage facility in tandem and depart the area.

38.    On April 17, 2024, Malek agreed to meet with the UC to sell him/her one pound of methamphetamine and an AR-15-style rifle.  Agents set up surveillance at the PREMISES before the transaction.  They observed Malek and Harper arrive at the facility in the same vehicles as they observed on April 15, 2024.  The vehicles later left the PREMISES in tandem, and eventually arrived for the deal with the UC.  As Malek met with the UC, Harper maintained a lookout position.  After the transaction was completed, the Malek and Harper left the deal in tandem.

39.    Agents field-tested the suspected methamphetamine, which returned a positive result for the presence of methamphetamine.

18

40.     On April 24, 2024 agents located Malek and Harper's vehicles parked at the WoodSpings Suites, 13001 Central Avenue NE, Albuquerque New Mexico. Agents and officers have been periodically checking this facility and have found Malek's vehicle parked there consistently throughout the day and nighttime hours.

41.     On April 30, 2024 Malek contacted the UC and advised he had obtained another 5,000 fentanyl tablets to sell for $5,000 and a Springfield Arms Echelon 9mm handgun to sell for $800. Malek agreed to meet the UC to complete this purchase on May 2, 2024. During the negotiation, Malek also attempted to sell a Glock 19 with two magazines and a drum magazine to the UC for $800.

42.     On May 2, 2024, officers learned Malek's room number, Room 205.  They also observed his vehicle parked in front of the facility.

43.     Based on the facts referenced above, I believe Malek and Harper are concealing controlled substances inside Room 205.

[Continued on Following Page]

**CONCLUSION**

44.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Kenneth A. Garcia-Schnakenberg
Task Force Officer
Drug Enforcement Administration

Electronically signed and telephonically sworn
on May 2, 2024:

THE HON. LAURA FASHING
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A

*Property to be searched*

The property to be searched is Room 205 at WoodSpring Suites, 13001 Central Avenue NE, Albuquerque, NM 87123, hereinafter "PREMISES," further described as a room within a hotel complex.

The search of the above PREMISES shall include the search of the entire room, and all persons located on the PREMISES on which the items to be seized could be concealed.

The search of the above PREMISES shall include all vehicles parked at, or in front of, the WoodSpring Suites that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicle may be established by evidence that anyone present within the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841(a)(1) and 846, as well as 18 U.S.C. §§ 2 and 922(o), those violations involving Timothy Malek and Ashlee Harper and occurring after February 12, 2024, including:

1. Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, keys, invoices, and reservation confirmation emails.

9. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

2

15. Firearms and ammunition, including but not limited to auto sears, handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the

3

electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

4